2023 IL App (1st) 210286-U

No. 1-21-0286

Order filed December 1, 2023

Sixth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 19 CR 4267 |
| | ) | |
| NARVEAL RAGGS, | ) | Honorable |
| | ) | James B. Linn, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE C.A. WALKER delivered the judgment of the court.
Justices Hyman and Tailor concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant's conviction for reckless discharge of a firearm is affirmed where the State proved beyond a reasonable doubt that defendant was not acting in self-defense.

¶ 2    Following a bench trial, defendant Narveal Raggs was convicted of armed habitual criminal (AHC) (720 ILCS 5/24-1.7(a) (West 2018)) and reckless discharge of a firearm (720 ILCS 5/24-1.5(a) (West 2018)) and sentenced to concurrent terms of six and three years in prison, respectively. On appeal, defendant challenges his conviction for reckless discharge of a firearm,

contending that the State failed to disprove that he acted in self-defense beyond a reasonable doubt. For the reasons that follow, we affirm.

¶ 3                                     I. BACKGROUND

¶ 4     Defendant's convictions arose from a December 22, 2018 shooting that took place around 7 p.m. outside a barbershop on the 1400 block of West 103rd Street in Chicago. Following the arrest, defendant and three codefendants, Michael Boykin, Keshawn Howze, and Marquez Robinson, who are not parties to this appeal, were charged with various weapons-related crimes in a 42-count indictment. Defendant was charged with one count of AHC (count I), four counts of unlawful use of a weapon by a felon (UUWF) (counts IV, V, VI, and VII), six counts of aggravated unlawful use of a weapon (AUUW) (counts VIII, IX, X, XI, XII, and XIII), and one count of reckless discharge of a firearm (count XIV).

¶ 5     Prior to trial, defendant filed an answer to the State's motion for discovery, indicating that he would be raising the affirmative defenses of necessity and self-defense. Defendant, Boykin, Howze, and Robinson proceeded to a joint bench trial.

¶ 6     The State's evidence at trial included several surveillance videos, including footage of the shooting; videotaped statements made to detectives by defendant and Boykin; and police testimony. The parties stipulated as to the reliability of the commercial surveillance camera system that recorded both east and west views of the block where the shooting took place. They also stipulated that the date stamps on the surveillance videos were correct "but the time was one hour ahead." The videos are included in the record on appeal and were reviewed by this court.

¶ 7     One surveillance video clip, referred to at trial as "Channel 1, No. 2745," was filmed by a camera mounted a few storefronts west of the barbershop. It depicts a gray or silver Infiniti sports

utility vehicle (Infiniti) parallel parking on the south side of the street, around seven or eight car-lengths west of the barbershop, at about 4:30 p.m. Six men emerge from the Infiniti. As identified at trial by police witnesses, the group includes defendant (wearing all dark clothing and dark shoes), Boykin (wearing a dark tracksuit with white stripes down the arms and legs), Howze (wearing a dark jacket and light-colored pants), and Robinson (wearing a dark hoodie with a white design on the front, dark pants, and white shoes). The remaining two men are not identified in the record on appeal. Defendant, Boykin, Howze, and Robinson walk eastward on the sidewalk, away from the camera, and appear to enter the barbershop. The other two men follow at a distance.

¶ 8     Two surveillance video clips depict the shooting. One, referred to at trial as "Channel 1, No. 0002," depicts the same view as described above, starting just after 7 p.m. At "20:00:16," the Infiniti's headlights and taillights turn on. Between "20:00:23" and "20:00:29," the six men from the earlier video come into view, emerging from the area near the barbershop's doorway with Boykin in the lead. The group walks westward along the sidewalk toward the Infiniti and the surveillance camera.

¶ 9     At "20:00:41" in the video, Boykin, who is about halfway to the Infiniti, pulls a handgun from his pants pocket. He walks a few paces with the handgun at his side and starts to put the handgun in his front waistband. At "20:00:45," he quickly raises the firearm and fires at least two shots westward, apparently toward something beyond the camera's frame. He then turns and runs eastward. While running, he fires multiple shots westward, falls, and gets back up. He then moves into the street, fires more shots, and returns to the sidewalk, where he shoots again, and then continues moving eastward until a gray or silver sports utility vehicle (SUV) speeds by from west to east.

¶ 10     At "20:00:45" in the video, defendant, who is a few paces behind Boykin and the closest man to the curb, moves his right arm far enough from the side of his body that a handgun is visible in his hand. Within that second, he raises his arm and fires multiple shots westward while he runs into the street. He turns eastward, runs around a parked sedan and back to the sidewalk, points the firearm westward, and then ducks between two parked cars. As the SUV speeds past, he returns to the sidewalk and runs eastward.

¶ 11     At "20:00:41" in the video, Howze's right arm comes into view. He is holding a handgun in his right hand. At "20:00:45," he raises the firearm and points it westward. He then turns eastward and runs three or four steps before falling to the ground, where he lies prone on the sidewalk for about ten seconds. As the SUV enters the camera's view from the west, Howze rolls to his right side and raises his firearm. He shoots at the SUV numerous times as it speeds by and then drops his right arm onto the sidewalk.

¶ 12     At "20:00:45" in the video, Robinson flinches and ducks, and then moves out of the camera's view, possibly into a storefront entrance. After the SUV passes, he reemerges onto the sidewalk, appears to pick up something from the ground near Howze's right hand, and runs eastward.

¶ 13     The second surveillance video of the shooting, referred to at trial as "Channel 2, No. 5903," was filmed by a camera mounted slightly east of the barbershop, facing west. When the video clip begins at "20:00:22," the Infiniti's lights are already on, and Boykin is emerging from the barbershop onto the sidewalk. The other five men follow him outside, with defendant appearing on the video at "20:00:26." The group walks westward, toward the Infiniti and away from the surveillance camera.

¶ 14    At "20:00:41," a gray or silver SUV with its lights off can be seen approaching from the west. At "20:00:45," the SUV, which is still west of the Infiniti, stops in the street. At "20:00:46," doors on both sides of it open. A man emerges from the driver's side of the SUV and one flash of gunfire can be seen coming from the area of his chest at "20:00:47." By "20:00:48," the man moves back behind the driver's side door and out of view. At "20:00:58," the SUV's doors close, its headlights flash, and it starts moving eastward, accelerating as it speeds out of the camera's frame.

¶ 15    From "20:00:41" through "20:00:45," the men on the sidewalk are too far from the camera to distinguish whether they are holding anything in their hands. At "20:00:46," they scatter. Defendant runs into the street, around a parked sedan, back to the sidewalk, and then eastward, pointing toward the SUV before he runs beyond the camera's view. Boykin runs eastward, shooting back toward the SUV, falls, runs into the street, shoots, returns to the sidewalk, and continues eastward. Howze runs a few steps before he falls to the ground, and then rolls to his side and shoots at the SUV numerous times as it drives by him. Robinson disappears, reappears after the SUV drives away, appears to pick up an object from the sidewalk near Howze, and then runs eastward.

¶ 16    In his videotaped statement, defendant told detectives that he, Howze, and other people he did not name were at the barbershop for a celebration and for Boykin to get his hair cut. Two or three seconds and "two steps" after he walked out of the barbershop's door, he heard shots and started running. Gesturing to his left thigh, he stated that as soon as he "turned," he felt that he had been hit. He did not know who fired the shots or where they came from because he kept running and did not look back. Defendant denied that he or anyone on his "side" was armed and he denied having gotten "into it" with anyone. He admitted having been "locked up" for firearm crimes in

the past but denied shooting a firearm that night. He explained to the detectives that he suffered a "through and through" gunshot wound to his left thigh.

¶ 17    In his videotaped statement, Boykin told the detectives that he was at the barbershop to get his hair cut. He said that as he, Howze, Robinson, and defendant exited the shop, a car pulled up, its doors opened, and people started shooting. Boykin ran. He denied that he or his group had weapons or returned gunfire. When asked whether what he was saying would correspond with a video of the incident, he first said he did not know, but then said, "Of course it's going to match up." He said he did not know how shell casings ended up on the sidewalk.

¶ 18    Chicago police officer Steven Sebek testified that on the evening in question, he was on patrol with his partners, Officers J. Siska and Jason Murdoch. Around 7 p.m., he saw Robinson, whom he identified in court, running westbound on the sidewalk of the 1400 block of West 103rd Street. The officers followed in their car as Robinson ran through an alley, along another sidewalk, and back toward 103rd Street. At a corner, Robinson bent over and placed a handgun on the ground in front of a residence on the 10300 block of South Church Street. Sebek exited the car and pursued Robinson on foot as he ran eastbound on 103rd Street and entered a barbershop. Sebek observed Howze, whom he identified in court, lying on the sidewalk. He followed Robinson into the barbershop and placed him in custody. Sebek then went back to the residence on Church Street and located the handgun Robinson had discarded, a Glock semiautomatic, which was recovered by an evidence technician.

¶ 19    In court, Sebek was shown clips of the surveillance video footage. In the clip referred to as "Channel 2, No. 2745," he identified defendant and Boykin, both of whom he also identified in court, as well as Robinson and Howze, as they entered the barbershop. In the clip referred to as

"Channel 2, No. 5903," Sebek identified the four men walking out of the barbershop and Robinson running on the sidewalk. Sebek also identified defendant, Boykin, Howze, and Robinson in the video clip referred to as "Channel 1, No. 0002."

¶ 20    Siska, who identified defendant, Boykin, Howze, and Robinson in court, testified that on the night in question, he was on patrol with Sebek and Murdoch. As he was driving eastbound on 103rd Street around 7 p.m., he saw Robinson jogging on the sidewalk. Robinson looked in the officers' direction, abruptly turned into an alley, and started running faster. The officers followed and told him to stop. Sebek exited the car and pursued Robinson on foot. At some point, Murdoch exited the car as well. Siska drove through the alley, continued following Robinson and Sebek, and saw them enter a barbershop. Siska also saw Howze, who said he believed he had been shot, lying on the ground. Siska assisted Howze and then entered the barbershop, where Sebek had Robinson in custody. When Siska exited the barbershop, he saw that Murdoch had Boykin in custody.

¶ 21    The officers canvassed the area. Sebek recovered a handgun and Siska observed a second handgun in the grass "right across the street from there and just a bit south." In court, Siska viewed surveillance footage in which he identified Howze lying on the ground and himself exiting his car. He also identified photographs of the handgun he found in the grass.

¶ 22    On cross-examination by Boykin's and Howze's counsel, which was adopted by defendant's counsel, Sebek agreed that he did not know who placed the handgun on the grass or when it was placed there.

¶ 23    Murdoch identified defendant, Boykin, Howze, and Robinson in court. He testified that around 7 p.m. on the night in question, he was on patrol with Sebek and Siska when he saw

Robinson running on 103rd Street with his hand in his hoodie pocket. Robinson looked in the officers' direction, turned into an alley, and increased his speed to a "full sprint." The officers followed him as he ran through the alley, along a cross street, and back toward 103rd. Two or three men in that area, one of whom was Boykin, looked in the direction of Robinson and the police and started running as well.

¶ 24    When the men split up, Murdoch exited the car and chased Boykin. After Murdoch caught up with Boykin in a nearby back yard, he placed him into custody and returned to 103rd Street. There, he saw Howze, who was lying on the ground and stating he had been shot. After "medical aid showed up," Murdoch and the other officers noticed shell casings littering the sidewalk and surveillance cameras installed on a commercial building on the block. A responding sergeant contacted the building's manager and arranged for the police to view "all the videos." In court, Murdoch viewed clips of the video footage. He identified defendant, Boykin, Howze, and Robinson in the footage.

¶ 25    Chicago police officer Donna Albrecht testified that on December 23, 2018, she responded to a call of an elderly woman who found a firearm in her backyard on the 10300 block of South Church Street. The woman directed Albrecht to the bottom of her back steps, where she pointed out a Springfield handgun and, about a foot away, a magazine. Albrecht recovered the items and inventoried them.

¶ 26    Chicago police detective Nathan Poole testified that he and his partner, Detective King, were assigned to investigate the shooting. At the scene, Poole directed an evidence technician to take photographs and collect evidence. In court, he viewed a number of those photographs and identified a gray Infiniti SUV parked on the 1400 block of 103rd Street, a shattered glass door on

a building across the street from the barbershop, and an apparent bullet strike to the front window and window frame on another building across the street from the barbershop.

¶ 27    The next day, Poole spoke with defendant, Boykin, and Robinson at the police station. The conversations were electronically recorded, and the videos of defendant and Boykin were played in court.

¶ 28    On cross-examination by Boykin's and Howze's counsel, which was adopted by defendant's counsel, Poole testified that when he canvassed the scene, a person provided him with a description of the vehicle that "was involved in the drive-by," as well as a description of the two men who "jumped out" of that vehicle. The person said that "the subject that exited the vehicle engaged in a gun battle with the subjects that [were] on the sidewalk." Poole agreed that defendant told him Boykin was at the barbershop getting a haircut, that there was some type of a celebration going on at the barbershop, and that he and his group "were shot upon." Poole further agreed that Boykin told him he had gotten his hair cut at the barbershop, that a car pulled up, and that a "dude jumped out of the car on the street and started shooting up on him and the other people that he was with."

¶ 29    The parties stipulated that if called as a witness, an evidence technician who was assigned to process the scene would have testified that among the items found were 69 fired cartridge cases, three fired bullets, five metal fragments, a Glock 30S .45-caliber semiautomatic handgun, and a Glock 20S 10-millimeter semiautomatic handgun. The parties further stipulated that an expert in firearm analysis would have testified that he conducted firearm comparison analysis on the recovered items. He determined that 14 cartridge cases were fired from the Glock 30S, 10 fired cartridge cases were fired from the Glock 20S, 29 cartridge cases were fired from the Springfield

Armory 9mm, 34 cartridge cases were fired from three unknown firearms, and the firearm origin could not be determined for the rest. The firearm origin could not be determined for four bullets, but two were not fired from the Glock 30S and one was not fired from the Glock 20S. The parties stipulated that no fingerprints were found on the three recovered handguns.

¶ 30    The parties stipulated that if called as a witness, an expert in trace chemistry would have testified that defendant, Boykin, and Robinson tested positive for gunshot residue. She concluded that defendant discharged a firearm, contacted a particle gunshot residue-related item, or had both his hands in the environment of a discharged firearm; Boykin discharged a firearm, contacted a particle gunshot residue-related item, or had his right hand in the environment of a discharged firearm; and Robinson contacted a particle gunshot residue-related item or had his left hand in the environment of a discharged firearm. The parties further stipulated that none of the four defendants had ever been issued a Firearm Owner's Identification (FOID) card or concealed carry license.

¶ 31    The State entered evidence "a certified copy of vehicle records for that vehicle which is the 2018 Infiniti that was outside of the car that these defendants got out of." The State also entered evidence certified copies of conviction for defendant under "case number 17 CR 0107702" and "17 CR 0646901."

¶ 32    Defendant made a motion for a directed finding. The circuit court granted the motion as to counts VI and VII, which charged UUWF and alleged he was on parole or mandatory supervised release at the time of the offense, and counts X and XIII, which charged AUUW and alleged he was under 21 years old at the time of the offense.

¶ 33    Boykin testified that on the evening in question, he drove to the barbershop with defendant, Howze, and Robinson to get his hair cut. He parked his car, an Infiniti, just west of the barbershop. He did not have a firearm and did not see a firearm on any of his friends.

¶ 34    While Boykin was getting his hair cut, a woman was promoting a clothing line as part of a Christmas event at the barbershop. Boykin's friends bought some clothing, and the woman posted their photos on Instagram and tagged the barbershop's address. Shortly thereafter, the woman showed Boykin and the barber a direct message she had received via Instagram, which stated, "[G]et them out the barbershop. We are going to kill you. We coming." The message was sent by a man Boykin knew as "Savage." Boykin testified that when he saw the message, he was scared and feared for his life because he knew "Savage" was dangerous.

¶ 35    The barber, who was panicking, told Boykin that he and his friends had to leave because he did not want his own life or the lives of the other people in the barbershop to be in danger. Boykin testified that a man he knew from the neighborhood, John Hampton, was present, and it was Hampton and his friends that supplied weapons to Boykins and his group. As Boykin, defendant, Howze, and Robinson walked out of the barbershop, Boykin hit the "lock" button on his car key fob, as he was planning to get in the car and drive away. An SUV with its lights off pulled up and stopped. Two men dressed all in black exited the SUV, pointed firearms at Boykin and his friends, and started shooting. In response, Boykin and his group returned fire. After the exchange of gunfire, the SUV left the scene.

¶ 36    On cross-examination, Boykin admitted that he was depicted discharging a firearm in the video. He agreed that he did not tell the detective who interviewed him that he had been threatened or that someone had given him a firearm. He also agreed he did not call the police before he left

the barbershop. When asked about the timing of his producing a firearm, he stated, "When he, when they came and got out and fired shots, that's when I upped the gun." Boykin agreed that he shot from the sidewalk, moved into the middle of the street, aimed the firearm, and fired more shots.

¶ 37    On redirect, Boykin testified that when he spoke with the detective, he did not want to get anyone in trouble, including Hampton.

¶ 38    Defendant testified that on the day in question, Boykin drove him, Howze, and Robinson to the barbershop. He did not have a weapon with him and, to the best of his knowledge, none of his friends did either. Before defendant could get his hair cut, Boykin "rushed to the back in a panic," stating that someone sent a direct message to "the clothing lady" with a threat that he was coming to kill them, and that the barber said they had to leave the barbershop. As defendant and his friends were walking out the door, an "older guy and his friends," whom defendant had seen in the barbershop before and who were "[k]ind of gang ish like," gave them weapons. Because he was in fear for his life and was afraid he was going to be killed, defendant took a weapon and put it in his waistband.

¶ 39    Defendant exited the barbershop. After taking two to three steps toward Boykin's car, with the intention of leaving the neighborhood, he "got shot." The shots were coming from a gray SUV that was "straight ahead." He did not know how many shots were fired at him but described it as "a lot." After being shot, defendant drew his weapon and fired in the direction of the gray SUV, then tried to take cover. He left the area of the barbershop, called his sister to come pick him up, and threw his weapon onto a roof. Defendant's sister drove him to the hospital, where he was

arrested. He told the police he knew nothing about the shooting because he "didn't want nobody getting in trouble."

¶ 40    On cross-examination, defendant stated that the "old dude" who gave him the weapon was named John, but he did not know John's last name. He also stated that he did not know who it was that threatened him. He agreed that when he found out about the threat, he did not call the police. He also did not tell the detectives who interviewed him that he had been threatened. He clarified that the person he did not want to get in trouble was himself. Finally, he stated that he did not know how many times he fired his weapon and that he tried to take cover toward the front of a "little car."

¶ 41    On redirect, defendant agreed that the reason he fired his weapon in the direction of the people who shot him was because he did not want to be shot again.

¶ 42    Following closing arguments, the circuit court found defendant guilty of AHC and reckless discharge of a firearm. It also found him guilty of "possession of a gun" but stated that the firearm possession charges merged into the AHC charge.[1] In the course of announcing its decision, the court stated as follows:

> "I watched the video. I watched it carefully. It did not appear to me that the way that the defendants who were firing guns were unfamiliar with the guns that they had possession of, that [they] didn't know they were loaded or how they had to fire or what they had to do to work them, they appeared aggressive, and they were after people.

---

[1] Robinson was acquitted, and Boykin and Howze were found guilty of reckless discharge of a firearm and AUUW.

And it's possible that you can have two groups of people, totally unrelated to each other that have—when I say unrelated to each other, totally on their own missions and they can both be aggressive and looking to do harm.

It's not that one of them has to be acting in self-defense and it's the question of which happened first, they can both be aggressive, and they can both be looking to do damage and to create havoc and that's what I believe happened.

I reject the suggestions that they were just given guns at the last moment because the way they came out of the barbershop quickly pulling the guns, using them aggressively, walking towards trouble, not away from trouble, firing multiple, multiple shots with guns that supposedly they only had in their possession for less than a minutes [*sic*] beforehand, they knew exactly what they were doing and I reject that part of the case."

¶ 43 Defendant filed a motion for a new trial, arguing, in relevant part, that the circuit court erred in failing to find him not guilty "by way of self-defense or necessity." The court denied the motion following a hearing. In rejecting the claim of self-defense or necessity, it stated as follows:

"These are the identical arguments that you stated during the trial. You can't have a situation where—the law is not going to provide for a situation where people get into social media quarrels and then feel that they have a right to arm themselves and go out and start shooting indiscriminately in the street putting the entire public at risk because somebody said something on social media.

In this case, I do see that [defendant] was shot when people were shooting back and forth. The defendant walked out of a barber shop with a gun at his waist and immediately pulled it out and started shooting. Somebody shot, like, a tenth of a second before or after.

To me, it was like two groups of predators looking for each other and shooting at the same time. I don't see that one was a victim in that there was not even time to think about self-defense. This was offensive activities by both sides and it was not a self-defense situation at all to me and certainly not a necessity situation. Because somebody said something on social media doesn't give you the right to go out on the street with guns at the ready, especially like they were here when they were used."

¶ 44   The circuit court subsequently sentenced defendant to concurrent terms of six years in prison for AHC and three years for reckless discharge of a firearm.

¶ 45                                II. ANALYSIS

¶ 46   On appeal, defendant challenges only his conviction for reckless discharge of a firearm, contending that the State failed to disprove that he acted in self-defense beyond a reasonable doubt.

¶ 47   When reviewing the sufficiency of the evidence, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979). All reasonable inferences from the evidence must be drawn in favor of the prosecution. *People v. Hardman*, 2017 IL 121453, ¶ 37. The credibility of the witnesses, the weight to be given their testimony, and the resolution of any conflicts in the evidence are within the province of the trier of fact, and a reviewing court will not substitute its judgment for that of the trier of fact on these matters. *People v. Brooks*, 187 Ill. 2d 91, 132 (1999). Reversal is justified only where the evidence is "so unsatisfactory, improbable or implausible" that it raises a reasonable doubt as to the defendant's guilt. *People v. Slim*, 127 Ill. 2d 302, 307 (1989).

¶ 48    Reckless discharge of a firearm occurs when a person discharges a firearm "in a reckless manner which endangers the bodily safety of an individual." 720 ILCS 5/24-1.5(a) (West 2018). Defendant does not dispute that the State proved the elements of reckless discharge of a firearm beyond a reasonable doubt. Rather, he maintains that he committed this crime in self-defense.[2]

¶ 49    To raise self-defense, a defendant must provide some evidence that (1) unlawful force was threatened against him; (2) he was not the aggressor; (3) the danger of harm was imminent; (4) his use of force was necessary; (5) he actually and subjectively believed danger existed which necessitated the use of the force applied; and (6) his beliefs were objectively reasonable. 720 ILCS 5/7-1 (West 2018); *People v. Lee*, 213 Ill. 2d 218, 225 (2004). Once a defendant meets this burden, the State must prove beyond a reasonable doubt that the defendant did not act in self-defense. *Lee*, 213 Ill. 2d at 224. The State carries this burden if it negates any one of the elements of self-defense beyond a reasonable doubt. *Id.* at 225.

¶ 50    Here, the circuit court found that the State negated the second element of self-defense, namely, that defendant was not the aggressor. Specifically, the court found that both groups of shooters were "aggressive and looking to do harm," explaining, "It's not that one of them has to be acting in self-defense and it's the question of which happened first, they can both be aggressive and they can both be looking to do damage and to create havoc and that's what I believe happened." The court further explained its finding when denying defendant's posttrial motion, stating, "[I]t

_____

[2] For the purposes of this appeal, we assume without deciding that self-defense may be asserted as an affirmative defense to the crime of reckless discharge of a firearm. See *U.S. v. Rice*, 673 F.3d 537, 542 (7th Cir. 2012) (finding that the defendant "did not act in self-defense under Illinois law when he committed the crimes of aggravated and reckless discharge of a firearm"); *People v. Niles*, 2021 IL App (1st) 181159-U, ¶ 38 (noting, "even assuming that self-defense or defense of others is a valid defense to reckless discharge," that the circuit court rejected the defendant's defense-of-others theory); Ill. S. Ct. R. 23(e)(1) (eff. Feb. 1, 2023) (nonprecedential Appellate Court orders entered on or after January 1, 2021, may be cited for persuasive purposes).

was like two groups of predators looking for each other and shooting at the same time. I don't see that one was a victim in that there was not even time to think about self-defense. This was offensive activities by both sides, and it was not a self-defense situation at all[.]"

¶ 51    Defendant challenges the circuit court's finding that he was "aggressive" due to his apparent familiarity with firearms, arguing that even if he was acquainted with firearms, that does not negate the evidence showing that his life was in danger, or that he was entitled to defend himself. He also challenges the court's statement that he and his friends were "walking towards trouble, not away from trouble." He asserts that they were approaching Boykin's car in an attempt "to flee the impending danger but were intercepted by it before they could escape." Defendant maintains that "[f]aced with no other choice and having been ejected from shelter," he was forced to defend himself.

¶ 52    Defendant maintains that the surveillance video footage corroborates his and Boykin's testimony that they only fired their weapons after being threatened and after he was shot. Specifically, he asserts that "a careful viewing of the video shows that [he] and his friends only returned fire after the van stopped and two of its occupants got out and opened fire." As such, he argues that the video evidence supports his testimony that he was in fear for his life based on a credible threat and that he had a justifiable reason to defend himself against imminent danger posed by "Savage" and the two men who shot at him. Finally, he argues that "[a]dditional support for self-defense is that the only two people injured in this incident were Howze and [himself]."

¶ 53    After carefully reviewing the surveillance videos and considering all the evidence in the light most favorable to the prosecution, we find that a rational trier of fact could have determined that the State negated the self-defense proposition that defendant was not the aggressor. The video

footage from the two surveillance cameras reveals that the SUV stopped in the street during the same exact second—"20:00:45"—that defendant, Boykin, and Howze raised their weapons and aimed them in the SUV's direction. This was prior to anyone from the SUV displaying a firearm. The footage further reveals that during the following two seconds, the SUV's doors opened, at least one man fired one shot from the driver's side of the SUV, and defendant and Boykin fired multiple shots.

¶ 54 We agree with the circuit court that there were "offensive activities by both sides and it was not a self-defense situation at all." Rather, the surveillance videos depict a mutual combat situation, where both groups fired at each other willingly and upon equal terms. Self-defense is not available as an affirmative defense in such circumstances. *People v. White*, 293 Ill. App. 3d 335, 338 (1997); see also *People v. Grayson*, 321 Ill. App. 3d 397, 402-03 (2001) (finding self-defense disproved where evidence indicated the defendant "instigated the entire incident or mutually entered into it").

¶ 55 We are mindful of defendant's trial testimony that, on his way out of the barbershop, he accepted a weapon from "John" because he was in fear for his life, and that he did not remove that weapon from his waistband until after being shot two to three steps from the barbershop door, at which time he fired back because he did not want to be shot again. However, the video footage contradicts defendant's testimony that he had taken only two to three steps from the barbershop door when he was shot. Both "Channel 1, No. 0002" and "Channel 2, No. 5903" depict defendant exiting the barbershop at "20:00:26" and then walking uninjured for at least 19 seconds before he begins to react to the SUV stopping in the street at "20:00:45." It is not clear from the videos when,

after that point, a bullet strikes defendant's leg, but it does appear that he takes about 30 unhindered steps along the sidewalk prior to the SUV stopping or any shooting taking place.

¶ 56    Moreover, the trier of fact is not required to accept as true a defendant's testimony regarding an incident and the need for self-defense. *People v. Murillo*, 225 Ill. App. 3d 286, 292 (1992). Instead, the trier of fact "must consider the probability or improbability of the testimony, the surrounding circumstances, and the testimony of other witnesses." *In re Jessica M.*, 399 Ill. App. 3d 730, 737 (2010). Here, the circuit court specifically rejected defendant's and Boykin's testimony that they only came into possession of firearms as they exited the barbershop. This was the court's prerogative in its role as the trier of fact (*People v. Moody*, 2016 IL App (1st) 130071, ¶ 52) and we will not substitute our judgment for that of the court on questions of credibility (*Brooks*, 187 Ill. 2d at 132).

¶ 57    Finally, we note that following the shooting, defendant took several actions that evidenced a consciousness of guilt and were inconsistent with having acted in self-defense. First, he fled the scene and attempted to avoid the police. See *People v. Brown*, 2012 IL App (2d) 110640, ¶ 19. Second, he discarded his firearm. See *People v. Harmon*, 2015 IL App (1st) 122345, ¶ 59; *People v. Seiber*, 76 Ill. App. 3d 9, 13-14 (1979). Third, despite having the opportunity to explain the circumstances of his use of force and claim self-defense, he lied to the police and made a false exculpatory statement denying having been armed or discharged a firearm. See *People v. Shaw*, 278 Ill. App. 3d 939, 951 (1996). Evidence of consciousness of guilt tends to refute a defendant's theory of self-defense. See *People v. Lester*, 102 Ill. App. 3d 761, 767 (1981).

¶ 58    We agree with the circuit court's conclusion that the State proved beyond a reasonable doubt that defendant did not act in self-defense where he engaged in mutual combat. As such, we

find that the evidence supporting defendant's conviction for reckless discharge of a firearm was not "so unsatisfactory, improbable or implausible" that it raises a reasonable doubt as to the defendant's guilt. *Slim*, 127 Ill. 2d 302, 307 (1989). Accordingly, defendant's challenge to the sufficiency of the evidence fails.

¶ 59    For the reasons explained above, we affirm the judgment of the circuit court.

¶ 60    Affirmed.